**Patricia O'DONNELL, Plaintiff,**

v.

**Charles COULSON, Defendant.**

**No. 1:97 CV 1229.**

United States District Court,
N.D. Ohio,
Eastern Division.

Nov. 9, 1998.

ment rights, promissory estoppel, breach of implied contract, fraud, and sexual harassment. Defendant now moves for summary judgment, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, on all of Plaintiff's claims. For the reasons that follow, Defendant's Motion For Summary Judgment (Document No. 34) is granted in part and denied in part.

## I. FACTS

In February of 1995, Plaintiff was hired by Defendant, the Lake County Prosecutor, for the Office Administrator position of the Lake County Prosecuting Attorney's office. According to Plaintiff, at the time she began working in this position, the office was disorganized. As a result, Plaintiff states, she had to deal with a backlog of work, perform the duties of both Office Administrator and Assistant Office Administrator, and do secretarial work for Defendant. According to Defendant, Plaintiff's job duties included acting as a personal secretary to him, supervising support staff, and assisting with the hiring for secretarial positions. At no time was a job description or written terms and conditions of employment given to Plaintiff.

Edward G. Kramer, Marc L. Stolarsky, David G. Oakley, Kramer & Nierman, Cleveland, OH, for Patricia O'Donnell, plaintiff.

Bradley L. Snyder, Roetzel & Andress, Columbus, OH, Mary Adele Springman, David G. Hill, Millisor & Nobil, Cleveland, OH, for Charles Coulson, In his individual and official capacity as Lake County Prosecuting Attorney's Office, defendant.

### ORDER

OLIVER, District Judge.

On May 7, 1997, Plaintiff, Patricia O'Donnell ("Plaintiff"), filed an action against Defendant, Charles Coulson ("Defendant"), alleging wrongful discharge in retaliation for asserting her First Amend-

In late 1996, Defendant sought to fill a vacant secretarial position in his office. Two of the applicants for this position were Debra Stallworth, an African-American, and Sheryl Niebecker, a Caucasian. Ordinarily, when a secretarial position became available, Plaintiff and an administrative assistant from the department in which there was an opening would screen the applicants for the position and perform the initial interviews of such individuals. As part of this initial screening and interview process, applicants for secretarial positions were given a typing test, spelling test, editing test, and alphabetizing test. Plaintiff would then rank these applicants according to test scores and present the names of the top applicants to Defendant. Defendant would then interview the applicants recommended by Plaintiff and make

the final decision regarding the open position.

In this instance, however, the normal hiring procedures of the office were not followed. Instead of Plaintiff, Defendant ranked the applicants himself. Defendant contends that he ranked the applicants himself because Plaintiff had failed to prepare a ranked list of applicants. Plaintiff contends, however, that Defendant ranked the applicants himself because he wanted to select Sheryl Niebacker, the sister-in-law of Congressman LaTourette, for the position. After Defendant ranked the applicants, he chose not to interview Ms. Stallworth and interviewed Ms. Niebecker. Ultimately, Defendant offered Ms. Niebecker the position, and she accepted the offer.

Once Plaintiff heard that Defendant had hired Ms. Niebecker, she expressed her concern to Defendant that she believed that he had discriminated against at least one protected individual, Ms. Stallworth. According to Plaintiff, Ms. Stallworth scored higher than Ms. Niebecker on the typing test. In fact, Plaintiff asserts that Ms. Niebecker could not even type the minimum number of words per minute. Additionally, Ms. Stallworth had previously applied for another position with the office in the summer of 1996, had been interviewed, and had been offered a position by Defendant, which she declined. Plaintiff states that Defendant responded negatively to her concerns about his hiring practices; more specifically, she states that Defendant became angry and red in the face and stated "this is my office" and "I'll hire whoever the fuck I want."

Less than one week later, on January 9, 1997, Plaintiff was terminated. Plaintiff states that she was not given a specific reason for her discharge at the time of her termination. According to Plaintiff, she was merely told that "things are not working out." Defendant contends that he fired Plaintiff due to her unsatisfactory and inadequate job performance and that he had made this decision to fire her be-

fore the "Niebecker" incident. Plaintiff, however, believes that Defendant fired her, in part, because she questioned his hiring decision. Plaintiff asserts that Defendant never indicated to her that her "work performance needed to be corrected or improved." Plaintiff's Response, Exhibit 1, ¶ 5. In fact, she states, Defendant often praised her work, in particular her correspondence with various Lake County officials and her handling of the Lake County Victim's Assistance Fund. Plaintiff also points to a letter of recommendation which Defendant wrote for her, which states that Plaintiff is a self-starter, voluntarily works beyond normal business hours, is mature, willingly takes on responsibilities, handles herself in a professional manner, and is of high integrity.

Furthermore, Plaintiff asserts, she was led to believe that she would be employed at the Lake County Prosecutor's office as long as Defendant was there. She bases this belief on statements made by Defendant, such as "you're not going anywhere" and "you're family." Additionally, she states that it was the informal custom of Defendant's predecessor to retain the individuals who supported the prosecutor. Plaintiff spent numerous days and hours working on Defendant's campaign, and she claims that she would not have done so if she did not believe that she was guaranteed continued employment (meaning as long as Defendant was there) if Defendant won. According to Plaintiff, Defendant broke his implied promise of continued employment, breached an implied contract, and committed fraud when he terminated her on January 9, 1997.

Lastly, Plaintiff claims that she was subjected to sexual harassment during her tenure with the prosecutor's office. Plaintiff states that, in June of 1996, Defendant placed his arm around Plaintiff's shoulder and stated in a suggestive manner "I really like you Pat" and "do you mind if I put my arm here." She further states that she immediately pulled away and stated that she felt uncomfortable. After this inci-

dent, she claims that Defendant began to treat her badly. Plaintiff states that, after this incident, she could no longer use her comp time unless it was an emergency, a condition not imposed on anyone else; she was no longer asked to accompany Defendant to Republican roundtable meetings; and she was subjected to arbitrary and inefficient changes in her work assignments, such as having every call for the prosecutor sent to her desk. She also claims that she was fired, in part, because she rejected the aforementioned alleged "sexual advance" by Defendant.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law . . .

A fact is material if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

Rule 56(e) specifies the way parties may establish those material facts when utilizing affidavits:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. . . .
> The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

The court then considers that evidence, along with the materials identified in Rule 56(c), in "the light most favorable to the party opposing the motion." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (citation omitted).

When considering whether the evidence shows there is a genuine issue of material fact preventing entry of judgment as a matter of law, the court should rule "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Accordingly, "[t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In most civil cases, then, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505.

Consequently, there are two methods by which a party who does not have the burden of proof at trial—here, Defendant—may pursue summary judgment. First, Defendant may put forth evidence showing the nonmovant—Plaintiff—will not be able to prove an essential element of his case at trial. Second, it may put forth affirmative evidence showing the truth of its claims or defenses. Under either method,

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Hence, if Defendant either adequately challenges Plaintiff's ability to carry his burden of proof or affirmatively prove one of its defenses, Defendant will then have an affirmative duty to point out specific facts in the record creating a genuine issue of material fact. *Liberty Lobby,* 477 U.S. at 256–257, 106 S.Ct. 2505.

### III. LAW AND ANALYSIS

#### A. First Amendment

■ Plaintiff alleges that Defendant violated her First Amendment rights when he discharged her, in part, because she spoke out against his decision to hire Ms. Niebecker. The determination of whether a public employee has been terminated for exercising her right to free speech requires a two-step process. *See Bailey v. Floyd County Bd. Of Educ.,* 106 F.3d 135, 144 (6th Cir.1997); *Rahn v. Drake Center, Inc.,* 31 F.3d 407, 411 (6th Cir.1994). The employee must first establish that her speech was constitutionally protected. *See Bailey,* 106 F.3d at 144. Speech is protected when it addresses a matter of public concern. *See id.; Rahn,* 31 F.3d at 411. Whether an employee's speech addresses a matter of public concern is a question of law. *See Rahn,* 31 F.3d at 411. If an employee's speech did not address a matter of public concern, no further inquiry is necessary. If the employee is able to demonstrate that his speech touches a matter of public concern, the employee then has the burden of showing that the speech was a motivating factor in the employer's decision to terminate his employment. *See Bailey,* 106 F.3d at 144. If any part of an employee's speech that contributes to the discharge relates to matters of public concern, the court must then determine whether the employee's interest in making such statements outweighs the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. *See id.*

In this case, Defendant concedes, for the purposes of this motion, that Plaintiff's speech touched a matter of public concern. Defendant, however, contends that Plaintiff cannot show that her speech was a substantial motivating factor in his decision to discharge her. Furthermore, Defendant states, even if Plaintiff can show that her speech was a motivating factor in the decision to terminate her, he is still entitled to summary judgment because the evidence indicates that he would have terminated Plaintiff regardless of her speech.

■ After careful consideration, the court finds that Plaintiff has created a genuine issue of material fact in regard to whether her speech motivated the decision to discharge her. First, the close temporal proximity between Plaintiff's speech and her discharge (less than one week) is simply hard to ignore. *See Van Richardson v. Burrows,* 885 F.Supp. 1017, 1022 (N.D.Ohio 1995) (finding that the timing of the adverse action could lead to an inference that the defendant's actions were retaliatory). Second, Plaintiff has presented evidence which contradicts Defendant's affidavit statement that she was fired due to poor performance;[1] in particular, Plaintiff has submitted an affidavit which states that she was often praised for her work, that she received a higher bonus/raise than any other person in the office, and that she was never informed that her performance was unsatisfactory or that it needed improvement. This, coupled with the fact that Defendant has provided no written documentation of an unsatisfactory record by Plaintiff, is evidence upon which a reasonable juror could infer that Plaintiff was discharged because of her speech and that Defendant's asserted reason for firing her was merely a cover-up. In sum, given the temporal proximity between Plaintiff's

---

1. Defendant has provided no written documentation concerning Plaintiff's poor job performance.

speech and her discharge, the evidence indicating that Plaintiff performed satisfactorily and was never informed of any problems with her work, and the lack of written documentation concerning Plaintiff's poor performance, the court finds that there is sufficient evidence from which a reasonable juror could conclude that Plaintiff was discharged because of her speech. *See, e.g., Bowles v. City of Camden,* 993 F.Supp. 255, 264 (D.N.J.1998) (finding, in a retaliatory discharge case under Title VII, that the plaintiff presented evidence sufficient to create an inference of discrimination where the plaintiff had, in addition to temporal proximity, pointed to the "absence of any record that the Mayor or anyone on his staff ever criticized plaintiff for his performance until the Mayor felt the need to publicly defend the firing decision" and "the internal inconsistencies in the Mayor's explanation and the inconsistency with the absence of documented dissatisfaction with plaintiff's performance").

Even so, Defendant states, he is still entitled to summary judgment on Plaintiff's First Amendment claim because the evidence indicates that he would have terminated Plaintiff regardless of her speech. More specifically, Defendant's affidavit indicates that he had decided to discharge Plaintiff because of her poor job performance before the "Niebecker" incident. As noted earlier, however, Plaintiff has submitted evidence which contradicts this assertion by Defendant; in particular, Plaintiff has submitted an affidavit which states that she was never informed that her performance was unsatisfactory or that it needed improvement. In other words, Plaintiff has successfully created a genuine issue of material fact regarding whether she was indeed fired for poor job performance. Consequently, Defendant's Motion For Summary Judgment (Document No. 34) is denied with respect to this claim.

## B. Sexual Harassment

Plaintiff alleges that she was sexually harassed when she rejected Defendant's alleged sexual advance (when Defendant stated "I really like you Pat" and asked "do you mind if I put my arm there"). Title VII states that "it shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). Case law recognizes two types of sexual harassment: (1) harassment that creates an offensive or hostile environment; and (2) quid pro quo harassment, in which a supervisor demands sexual favors as a condition for job benefits. *See Kauffman v. Allied Signal, Inc., Autolite Division,* 970 F.2d 178, 182 (6th Cir. 1992); *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 618 (6th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987).

■ To prevail in a Title VII hostile environment action, a plaintiff must prove that (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment complained of was based on sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive work environment that affected seriously the psychological well-being of the plaintiff; and (5) the existence of respondeat superior liability. There is both an objective and subjective component to asserting a hostile environment claim. To establish such a claim, plaintiff must show that the complained of conduct is severe or pervasive enough to create an interference with the work of and affect the psychological wellbeing of a reasonable person under like circumstances. Assuming that the plaintiff has established this component, she must then demonstrate that she was actually offended by the defendant's conduct

and that she suffered some degree of injury as a result of the abusive and hostile work environment. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Rabidue*, 805 F.2d at 620.

■ To prevail under a quid pro quo theory, a plaintiff must show: (1) that she was a member of a protected class; (2) that she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the employee's submission to the unwelcome advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of respondeat superior liability. *See Kauffman*, 970 F.2d at 186; *Highlander v. KFC Nat'l Management Co.*, 805 F.2d 644, 648 (6th Cir.1986).

In this case, Plaintiff states that she is asserting a claim of sexual harassment under the quid pro quo theory. Plaintiff alleges that she was sexually harassed when she rejected Defendant's alleged sexual advance (when Defendant stated "I really like you Pat" and asked "do you mind if I put my arm there" in June of 1996). She claims that, after this incident, Defendant became curt and rude; he told her that she could no longer use her comp time unless it was an emergency, a condition allegedly not imposed on anyone else; he no longer invited her to accompany him to Republican Party roundtable meetings; he subjected her to inefficient work assignments, and he discharged her. Defendant argues that Plaintiff cannot prove a *prima facie* case of quid pro quo harassment because the "shoulder incident" does not constitute a sexual advance. More specifically, Defendant asserts that Defendant's language during this incident was not suggestive or appealing to the prurient interest and that his touching Plaintiff's shoulder was not suggestive. Moreover, Defendant argues, even if such conduct

constituted a sexual advance, Plaintiff suffered no tangible job detriments.

■ After careful consideration, the court finds that Plaintiff has raised a genuine issue of material fact with respect to her sexual harassment claim. At the outset, the court notes that Defendant's actions during the "shoulder incident" could reasonably be interpreted in a number of ways, and it is for the jury to decide whether such actions constitute a sexual advance or sexual misconduct. Furthermore, this court's decision focuses not on Defendant's behavior but on whether toleration of that behavior was linked to some threatened or actual adverse action affecting the compensation, terms, conditions, or privileges of Plaintiff's job. *See Bridges v. Eastman Kodak Co.*, 885 F.Supp. 495, 497 (S.D.N.Y.1995) (stating that the defendants had wrongfully honed in "on the term 'sexual advances,' concluding that the court intended to limit a quid pro quo harassment claim to only those claims where an employer makes explicit sexual overtures"). In this case, there is sufficient evidence from which a reasonable juror could conclude that Plaintiff's rejection of Defendant's alleged sexual advance (assuming a jury finds that he engaged in sexual misconduct) was linked to an actual adverse action affecting the compensation, terms, conditions, or privileges of Plaintiff's job: her discharge. Plaintiff has submitted an affidavit which suggest that Defendant began to treat her in a more negative manner after she expressed her discomfort with his actions in June of 1996. In particular, Plaintiff states that after such incident, Defendant became curt and rude; that he told her that she could no longer use her comp time unless it was an emergency, a condition allegedly not imposed on anyone else; that he no longer invited her to accompany him to Republican Party roundtable meetings; that he subjected her to inefficient work assignments, and that Defendant eventual-

ly discharged her in January of 1997.[2] Admittedly, some of the alleged "adverse" actions—Defendant's being rude to Plaintiff, Plaintiff's no longer being invited to accompany Defendant at Republican Party roundtable meetings, and the one noted, inefficient change in Plaintiff's work assignment (having every caller asking for the prosecutor sent to her desk)—did not affect either the compensation, terms, conditions, or privileges of Plaintiff's job. However, the evidence concerning these alleged "adverse" actions is not completely useless, as it helps to establish a pattern of mistreatment which could have lead to Plaintiff's discharge, an act which clearly affected the compensation, terms, conditions, or privileges of Plaintiff's job. In other words, although there is a seven-month gap in between the "shoulder" incident and Plaintiff's discharge, Plaintiff's statements concerning other, smaller "adverse" actions, together with the evidence indicating that Plaintiff performed satisfactorily and was never informed of any problems with her work and the lack of written documentation concerning Plaintiff's poor performance, provide some basis upon which a reasonable juror could make a connection between the alleged harassing incident and Plaintiff's discharge.

In sum, Plaintiff has successfully created a genuine issue of material fact regarding her sexual harassment claim. Consequently, Defendant's Motion For Summary Judgment (Document No. 34) is denied with respect to this claim.

### C. Promissory Estoppel

Plaintiff argues that Defendant was promissorily estopped from discharging her because he promised her continued employment (as long as he was in office) when he told her that her employment was based on his winning the election, that she was "not going anywhere," and that she was "family." Plaintiff further states that she relied on this promise to her detriment when she spent numerous hours and days working on Defendant's campaign.

■■■ The general rule in Ohio is that unless otherwise agreed to by the parties, an employment agreement purporting to be permanent or for life, or for no fixed time period is considered to be employment terminable at the will of either party. *See Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1040 (6th Cir.1992). However, evidence of the character of the employment, custom, the course of dealing between the parties, company policy, or other circumstances may transform an employment-at-will agreement into an implied contract for a definite term. *See Weiper v. W.A. Hill & Assocs.*, 104 Ohio App.3d 250, 257, 661 N.E.2d 796 (1995). Unless the terms of the agreement or circumstances manifest the parties' mutual intent to bind each other, however, the Ohio Supreme Court has evidenced a strong presumption favoring employment at will. *See id.* In this case, Plaintiffs and Defendant had no written or oral employment agreement purporting to be for a fixed period of time. Consequently, Plaintiffs' employment is considered at-will unless the evidence

---

2. The court notes that Plaintiff's affidavit statement concerning her use of comp time is not admissible for defeating Defendant's motion for summary judgment, as it directly contradicts her deposition testimony. "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck and Company*, 790 F.2d 453, 460 (6th Cir.1986) (citing *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir.1984)). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* (citing *Biechele*, 747 F.2d at 215) (quoting *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969)). In her deposition testimony, Plaintiff stated that Defendant began to treat her differently with respect to comp time prior to Christmas in 1995, at least six months before the "shoulder incident;" Plaintiff also stated that there was no relationship between the "shoulder incident" in June of 1996 and the detriment to her with respect to her use of comp time. *See* Plaintiff's Deposition, pp. 288, 292–93.

shows otherwise. To prove a claim for promissory estoppel, a plaintiff must show that (1) the employer made a clear, unambiguous promise; (2) the plaintiff relied on that promise; (3) the reliance was justifiable; and (4) the reliance caused detriment to the plaintiff. *See Awada v. University of Cincinnati,* 83 Ohio Misc.2d 100, 680 N.E.2d 258, 261 (1997) (citations omitted).

■ After careful consideration, the court finds that Plaintiff's promissory estoppel claim must fail because she cannot show that Defendant made a clear and unambiguous promise of continued employment to her. First, Defendant's alleged promises that Plaintiff's employment was based on his winning the election, that Plaintiff was "not going anywhere," and that she was "family" are too vague to constitute a clear and explicit promise of future continued employment. *See Weiper v. W.A. Hill & Assocs.,* 104 Ohio App.3d 250, 661 N.E.2d 796, 801 (1995) (finding that the comment that the plaintiff would be making "a lot of money for the company for a long time to come" was not sufficient to establish a promise of continued employment); *Belt v. Roadway Express, Inc.,* 83 Ohio App.3d 706, 615 N.E.2d 702, 704 (1992). Furthermore, even if there was such a promise of continued employment, Plaintiff cannot show that she relied to her detriment on this promise. The fact that Plaintiff worked many hours and days on Defendant's campaign cannot be considered additional consideration. To begin, Plaintiff was already working for Defendant at the time she began working on Defendant's campaign. Furthermore, it is clear that Plaintiff was working just as much for herself as she was working for Defendant when she volunteered to work on his campaign. After all, if Defendant lost, Plaintiff would have had no chance of further employment at the prosecutor' office. *See Peters v. Mansfield Screw Machine Prods. Co.,* 73 Ohio App.3d 197, 596

N.E.2d 1071 (1991) (finding that there was no express employment contract where the statement was made after the employee started her job, there was no new evidence of additional consideration, and no evidence that the employee refrained from seeking or passed up other employment opportunities); *see also* Plaintiff's Deposition pp. 169–70 (stating that she understood that her job was subject to political appointment, meaning she would have no job if Defendant was not the prosecutor). Lastly, there is no claim by Plaintiff that she passed up other job opportunities in reliance of this alleged promise of continued employment.[3]

### D. Breach Of Implied Contract

■ Plaintiff argues that Defendant breached his implied contract with her to employ her for the duration of his term in exchange for her work on his campaign. For the reasons noted in Section III.C., the court finds that Plaintiff has failed to create a genuine issue of material fact as to the existence of such implied contract. Consequently, Defendant's Motion For Summary Judgment (Document No. 34) is granted with respect to this claim.

### E. Fraud

■ Plaintiff alleges that Defendant committed fraud by allowing Plaintiff to work on his campaign when he knew he was going to fire her and he knew that she was relying upon his assurances of job stability so long as he won the election. To prove fraud, a plaintiff needs to show that a representation was made which was material and was made with knowledge of its falsity and with the intent to mislead plaintiff reasonably to rely upon it to her detriment, with resulting damage proximately caused by this reliance. *See Russ v. TRW, Inc.,* 59 Ohio St.3d 42, 570 N.E.2d 1076, 1083 (1991). For the reasons noted in Section III.C., namely that Plaintiff can-

---

**3.** Also, the fact that Defendant's predecessor had a custom of protecting the jobs of his staff has no bearing on this case. Defendant can-

not be bound by the customs and promises of other prosecutors.

not prove that Defendant made such assurances, the court finds that Plaintiff has failed to create a genuine issue of material fact regarding her fraud claim. Consequently, Defendant's Motion For Summary Judgment (Document No. 34) is granted with respect to this claim.

## CONCLUSION

In sum, Defendant's Motion For Summary Judgment (Document No. 34) is denied in part and granted in part. It is denied with respect to Plaintiff's First Amendment and sexual harassment claims and granted with respect to Plaintiff's promissory estoppel, breach of implied contract, and fraud claims.

IT IS SO ORDERED.